**ORAL ARGUMENT SCHEDULED FOR DECEMBER 9, 2024**

**Nos. 23-1264, 23-1287, 24-1032, 24-1033**

**(consolidated)**

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SUNFLOWER ELECTRIC POWER CORPORATION; MIDWEST ENERGY, INC.,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

_____

On Petitions for Review of Agency Action by the
United States Federal Energy Regulatory Commission,
Nos. ER22-1846-002, ER22-1846-003, ER22-1846-004

_____

## BRIEF FOR PETITIONERS

_____

HELGI C. WALKER
WILLIAM R. HOLLAWAY
JEFFREY LIU
REED SAWYERS
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel for Petitioner
Midwest Energy, Inc.*

ERIN E. MURPHY
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

*Supervised by principals of the firm who
are members of the Virginia bar

*Counsel for Petitioner Sunflower
Electric Power Corporation*

October 24, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Sunflower Electric Power Corporation and Midwest Energy, Inc. certify that they do not have a parent corporation and that no publicly held corporation owns more than ten percent of their stock.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.      Parties and *Amici*

Sunflower Electric Power Corporation ("Sunflower") is the petitioner in case numbers 23-1264 and 24-1033.  Midwest Energy, Inc. ("Midwest Energy") is the petitioner in case numbers 23-1287 and 24-1032.  The petitions are consolidated under lead case number 23-1264.  Respondent is the Federal Energy Regulatory Commission ("FERC").

There are no *amici* but the Court has granted motions to intervene from the following parties in the consolidated cases:  American Electric Power Service Corporation; Basin Electric Power Cooperative; City Utilities of Springfield, Missouri; Kansas City, Kansas Board of Public Utilities; Kansas Corporation Commission; Kansas Electric Power Cooperative, Inc.; Louisiana Public Service Commission; Missouri Joint Municipal Electric Utility Commission; Oklahoma Gas and Electric Company; Southwest Power Pool, Inc.; and Xcel Energy Services Inc. Pursuant to Circuit Rule 15(b), all parties are deemed to have intervened in all cases in this consolidated proceeding.

Parties to the proceedings before FERC include:  Ameren Services Company; American Electric Power Service Corporation; Arkansas Electric Cooperative Corporation; Basin Electric Power Cooperative; City Utilities of Springfield, Missouri; Evergy Kansas Central, Inc.; Evergy Metro, Inc.; Evergy Missouri West,

Inc.; ITC Great Plains, LLC; Kansas City, Kansas Board of Public Utilities; Kansas Corporation Commission; Kansas Electric Power Cooperative, Inc.; Midwest Energy, Inc.; Missouri Joint Municipal Electric Utility Commission; Oklahoma Gas & Electric Company; Public Utility Commission of Texas; Southwest Power Pool, Inc.; Southwest Transmission, LLC; Sunflower Electric Power Corporation; The Empire District Electric Company; Western Area Power Administration; and Xcel Energy Services Inc.

### B.    Rulings Under Review

*Sw. Power Pool, Inc.*, Order Setting Aside Prior Order and Dismissing Compliance Filing, Docket Nos. ER22-1846-002 and ER22-1846-003, 184 FERC ¶61,028 (July 13, 2023) ("Reversal Order").

*Sw. Power Pool, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. ER22-1846-004, 184 FERC ¶62,145 (Sept. 14, 2023) ("Rehearing Notice").

*Sw. Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. ER22-1846-004, 185 FERC ¶61,189 (Dec. 19, 2023) ("Rehearing Order").

### C.    Related Cases

The Court ordered case numbers 23-1264, 23-1287, 24-1032, and 24-1033 consolidated.  Counsel is aware of the following related cases that arise from the

same underlying FERC proceeding: *City Utils. of Springfield, Mo. v. FERC*, No. 23-1054 (D.C. Cir.); *Am. Elec. Power Serv. Corp. v. FERC*, No. 23-1097 (D.C. Cir.). The Court initially consolidated case numbers 23-1054 and 23-1097 with Sunflower and Midwest Energy's petitions but subsequently severed them and held them in abeyance.  There are no other related cases, and this matter has not previously been before this Court or any other court.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............. ii

    A.    Parties and *Amici* ................................................................... ii

    B.    Rulings Under Review ........................................................ iii

    C.    Related Cases ..................................................................... iii

TABLE OF AUTHORITIES................................................................... vii

GLOSSARY OF ABBREVIATIONS ..................................................... xi

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 5

STATUTES AND REGULATIONS ......................................................... 5

STATEMENT OF THE ISSUES ............................................................. 5

STATEMENT OF THE CASE.............................................................. 6

I.     Statutory and Regulatory Background ...................................... 6

II.    Factual Background ............................................................. 9

    A.    The "Highway/Byway" Cost-Allocation Scheme............... 9

    B.    A Change in the Wind ...................................................... 10

    C.    Stakeholder Review and Recommendations..................... 13

III.   Procedural Background ...................................................... 15

    A.    FERC's Rejection Order.................................................... 15

    B.    SPP's Updated Tariff Amendment ..................................... 16

    C.    FERC's Approval Order ................................................. 18

    D.    FERC's Reversal Order ................................................... 22

E.      FERC's Rehearing Order .................................................. 24

SUMMARY OF ARGUMENT.............................................................. 26

STANDING.......................................................................................... 29

STANDARD OF REVIEW ................................................................. 29

ARGUMENT ....................................................................................... 30

I.      FERC's Reversal And Rehearing Orders Violate The Cost-Causation Principle And The Agency's Duty To Ensure Just And Reasonable Rates ........................................................................ 30

A.      FERC Is Statutorily and Regulatorily Bound to Ensure that Rates Comply with the Long-Standing Cost-Causation Principle............................................................ 30

B.      FERC's Rejection of SPP's Tariff Amendment Violates the Cost-Causation Principle Twice Over ................................. 33

II.     FERC's "Undue Discrimination" Concerns Mark An Unjustified And Unjustifiable Departure From Past Commission Findings And Precedent And Find No Support In The Record ........................................... 40

A.      FERC Failed to Adequately Explain Its About-Face or Address the Serious Reliance Interests That Its Actions Engendered ......................................................... 41

B.      FERC's Reversal and Rehearing Orders Mark a Deviation from Longstanding Agency Policy Without an Adequate Explanation...................................................... 48

CONCLUSION ................................................................................... 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Advanced Energy Mgmt. All. v. FERC*,
  860 F.3d 656 (D.C. Cir. 2017) ..........................................................39

*Algonquin Gas Transmission Co. v. FERC*,
  948 F.2d 1305 (D.C. Cir. 1991)........................................................54

*Atl. City Elec. Co. v. FERC*,
  295 F.3d 1 (D.C. Cir. 2002)..............................................6, 30, 31, 33

*Belmont Mun. Light Dep't v. FERC*,
  38 F.4th 173 (D.C. Cir. 2022)...........................................................48

*Cal. Indep. Sys. Operator Corp. v. FERC*,
  372 F.3d 395 (D.C. Cir. 2004)..........................................................47

*Cal. Pub. Utils. Comm'n v. FERC*,
  20 F.4th 795 (D.C. Cir. 2021)...........................................................43

*Chevron, U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*,
  467 U.S. 837 (1984).........................................................................32

*City of Winnfield v. FERC*,
  744 F.2d 871 (D.C. Cir. 1984)..........................................................39

*Consol. Edison Co. v. FERC*,
  45 F.4th 265 (D.C. Cir. 2022) ..............................................32, 38, 40

*Constellation Mystic Power, LLC v. FERC*,
  45 F.4th 1028 (D.C. Cir. 2022) ........................................................32

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020).............................................................................47

*El Paso Elec. Co. v. FERC*,
  76 F.4th 352 (5th Cir. 2023) ............................................................32

*Farmers Union Cent. Exch., Inc. v. FERC*,
  734 F.2d 1486 (D.C. Cir. 1984)..............................................30, 32, 40

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)............................................................42, 47

*FERC v. Elec. Power Supply Ass'n*,
  577 U.S. 260 (2016).........................................................7, 31, 38

Ill. Com. Comm'n v. FERC,
  756 F.3d 556 (7th Cir. 2014) .............................................32

Long Island Power Auth. v. FERC,
  27 F.4th 705 (D.C. Cir. 2022)............................................38

Louisville Gas & Elec. Co. v. FERC,
  988 F.3d 841 (6th Cir. 2021) ........................................33, 38

Michigan v. EPA,
  268 F.3d 1075 (D.C. Cir. 2001).........................................30

MISO Transmission Owners v. FERC,
  45 F.4th 248 (D.C. Cir. 2022).......................................36, 42

Morgan Stanley Cap. Grp. Inc.
  v. Pub. Util. Dist. No. 1 of Snohomish Cnty.,
  554 U.S. 527 (2008)...........................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.
  v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)....................................................29, 37, 46

Nat'l Fuel Gas Supply Corp. v. FERC,
  811 F.2d 1563 (D.C. Cir. 1987).........................................33

New Eng. Power Generators Ass'n, Inc.
  v. FERC,
  881 F.3d 202 (D.C. Cir. 2018).........................................40

NRG Power Mktg., LLC
  v. Me. Pub. Utils. Comm'n,
  558 U.S. 165 (2010)..........................................................6, 7

*Old Dominion Elec. Coop. v. FERC*,
  898 F.3d 1254 (D.C. Cir. 2018)........................9, 31, 32, 34, 35, 37

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) ...............................................................51

*W. Deptford Energy, LLC v. FERC*,
    766 F.3d 10 (D.C. Cir. 2014)................................................................48

*Wabash Valley Power Ass'n, Inc. v. FERC*,
    268 F.3d 1105 (D.C. Cir. 2001)...........................................................29

**Statutes**

5 U.S.C. § 706 ...........................................................................29, 30, 31

16 U.S.C. § 824d...........................................................................5, 6, 7, 31

16 U.S.C. § 824e ...........................................................................6, 7, 38

16 U.S.C. § 825*l*..................................................................................5

**Other Authorities**

*Transmission Planning and Cost Allocation by Transmission Owning
    and Operating Public Utilities*, Order No. 1000,
    136 FERC ¶ 61,051 (2011) ...................................................8, 31, 52

*Building for the Future Through Electric Regional Transmission
    Planning and Cost Allocation*, Order No. 1920
    187 FERC ¶ 61,068 (2024) ................................................................9

*Improvements to Generator Interconnection Procedures and
    Agreements*, Order No. 2023
    184 FERC ¶ 61,054 (2023) ...............................................................17

*Standardization of Generator Interconnection Agreements and
    Procedures*, Order No. 2003,
    104 FERC ¶ 61,103 (2003)...............................................................17

*Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*,
    162 FERC ¶ 61,213 (2018)...............................................................52

*Policy Statement Regarding Regional Transmission Groups*,
    1991-1996 FERC Stats. & Regs., Preambles ¶ 30,976 (1993)............8

*New Eng. Power Pool*,
  105 FERC ¶ 61,300 (2003) ....................................................................8

*PJM Interconnection, LLC*,
  174 FERC ¶ 61,064 (2021) ..................................................................53

*Sw. Power Pool, Inc.*,
  111 FERC ¶ 61,118 (2005) ..................................................................53

*Sw. Power Pool, Inc.*,
  127 FERC ¶ 61,283 (2009) ....................................................................8

*Sw. Power Pool, Inc.*,
  131 FERC ¶ 61,252 (2010) ...............................................................9, 10

*Sw. Power Pool, Inc.*,
  137 FERC ¶ 61,075 (2011) ....................................................................9

SPP Open Access Transmission Tariff,
  attach. O (July 26, 2010) ....................................................................52

Sw. Power Pool Mkt. Monitoring Unit, *State of the Market 2020*
  (Aug. 12, 2021), https://rb.gy/akpxns ................................................11

Sw. Power Pool Mkt. Monitoring Unit, *State of the Market 2022*
  (May 15, 2023), https://rb.gy/zb3w95 ................................................11

Sw. Power Pool Mkt. Monitoring Unit, *State of the Market Fall 2023*
  (Feb. 12, 2024), https://rb.gy/o1jy6c ................................................11

FERC Off. of Energy Pol'y & Innovation, *2023 State of the Markets*
  (Mar. 21, 2024), https://rb.gy/lv9sk7 ................................................11

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| FPA | Federal Power Act |
| FERC | Federal Energy Regulatory Commission |
| RTO | Regional Transmission Organization |
| ISO | Independent System Operator |
| SPP | Southwest Power Pool |
| PJM | Pennsylvania-New Jersey-Maryland Interconnection |

**INTRODUCTION**

This case lies at the intersection of the developing energy market and the mandate of the Federal Power Act ("FPA") that the transmission and sale of electricity be just, reasonable, and not unduly discriminatory.  Core to that mandate is the long-standing "cost-causation" principle, which requires that the costs customers pay for energy be roughly commensurate with the benefits they receive. To manage the energy market consistent with that requirement, Southwest Power Pool ("SPP")—a creature of the Federal Energy Regulatory Commission ("FERC") that coordinates the provision and supply of energy across a multi-state region—set out over a decade ago to establish a system of just and reasonable cost allocation. That system, known as the Highway/Byway methodology, allocates costs across the SPP region for high-voltage ("Highway") transmission facilities that principally serve the region, while allocating them primarily locally for lower-voltage ("Byway") facilities that historically have principally served the area in which they are located.  Created a decade-and-a-half ago, the plan was designed with traditional energy sources like coal and gas in mind, and for years matched costs to benefits consistent with the cost-causation principle.

But the energy market has changed.  Most notably for present purposes, wind generation has increased significantly, especially in the SPP region; wind now represents the largest portion of total energy generated in that region, ahead of coal

and gas.  But unlike coal and gas, wind power is generated in significant quantities only in certain wind-rich areas, and the wind-power supply in those areas outpaces local demand.  That, in turn, means that more transmission is needed to get wind energy to the rest of the SPP region—indeed, so much more that certain Byway facilities now play more of a regional role rather than a local one.

Unfortunately, the Highway/Byway methodology fails to account for that dynamic, as it continues to allocate the costs of all Byway facilities predominantly to consumers in geographic areas, referred to as "zones," where the facilities are located even if they are mostly used to transmit energy to the entire region.  Today, in the face of those *regional* benefits, allocating costs mostly *locally* no longer complies with the cost-causation principle in all circumstances.  Western Kansas, where Petitioners operate, is a prime example:  Customers in wind-rich zones there presently pay up to four times the median Byway transmission cost paid by customers in other SPP zones, largely because they are subsidizing the transmission of vast amounts of wind energy that is not owned or utilized by Petitioners, for the benefit of the whole region.

To address the violation of the cost-causation principle brought on by the increased generation and regional use of wind energy, Petitioners and SPP undertook an extensive, multi-year stakeholder process.  After a robust back-and-forth with various committees, state representatives, and interested parties, SPP proposed to

2

FERC a narrow solution:  a tariff amendment creating a waiver process whereby Byway facilities facing a cost-benefit imbalance could apply for an exception to the default cost allocation to re-align the costs and benefits of wind energy.

FERC initially rejected the proposal, expressing concern that it gave the SPP Board too much discretion and provided too little transparency into the waiver process.  But FERC lauded SPP's efforts to address the cost-causation problem associated with certain Byway facilities and directed SPP to fix those deficiencies and file again.  SPP did just that.  It bounded the Board's discretion with a trio of objective and stringent criteria to obtain a waiver and opened up the waiver process to scrutiny and transparent debate by adopting multiple layers of public findings, recommendations, and opportunities for participation by all interested parties.

Based on those targeted adjustments, FERC approved the proposal, with two minor edits.   In doing so, FERC recognized the imbalance in the current Highway/Byway system, found unequivocally that SPP's proposal would better ensure compliance with the cost-causation principle, and determined that the proposal presented no risk of undue discrimination.   Sunflower subsequently submitted the first (and only) waiver application.

Nine months later, after a change in FERC's composition, everything changed. FERC reversed course and retroactively *rejected* SPP's tariff amendment in full, without any discussion of the implications of that rejection on cost causation or the

serious reliance interests its own actions had engendered.  Instead, in just four scant paragraphs, FERC found that the same adjustments it recommended were actually insufficient and speculated that the proposal might lead to a risk of undue discrimination.  On rehearing, FERC did little to try to bolster its flimsy rationale.

FERC's orders rejecting SPP's tariff amendment are wrong at every turn. FERC made no effort to reconcile its actions with the cost-causation principle, a core requirement of the entire regime.  That is particularly troubling given that some Commissioners who ended up in the majority—after dissenting from FERC's initial approval of the tariff amendment—repeatedly expressed opposition to what they labeled "socializing" the costs of transmitting wind energy.  That is just another way of saying that those who benefit from the wind energy that generators produce in wind-rich areas should not have to pay their fair share of the cost of transmitting it to them.  But the cost-causation principle *requires* aligning costs and benefits, and it applies with full force no matter what kind of energy is being transmitted.  FERC also refused to explain why it was abandoning findings made not even one year earlier, identifying no change in fact, law, or anything else that might justify their wholesale abandonment.  Indeed, the only evident thing that changed was the membership of the Commission.  And what little justification FERC offered for its about-face contradicts the plain terms of the tariff amendment, SPP's representations about how it would work, the factual record, and FERC's precedent.

In short, FERC was right the first time. FERC's about-face nine months later flouts its statutory mandate, is littered with flawed reasoning, and junks the product of a lengthy stakeholder process. The Court should vacate, remand, and order FERC to approve SPP's proposal, or at minimum, reconsider the evidence before it and issue a reasoned explanation for its decisional 180.

## JURISDICTIONAL STATEMENT

Petitioners seek review of orders of the Federal Energy Regulatory Commission under the Federal Power Act, 16 U.S.C. §791a et seq. FERC issued the Reversal Order on July 13, 2023, and the Rehearing Notice, denying rehearing by operation of law, on September 14, 2023. Petitioners Sunflower Electric Corporation and Midwest Energy, Inc. timely petitioned for review on September 15, 2023, and October 16, 2023, respectively, within 60 days of the denial of rehearing. *Id.* §825*l*(b). On December 19, 2023, FERC issued the Rehearing Order, and Sunflower and Midwest Energy again timely petitioned for review on February 16, 2024. The Court therefore has jurisdiction under 16 U.S.C. §825*l*(b).

## STATUTES AND REGULATIONS

Pertinent statutes are set forth in the Addendum.

## STATEMENT OF THE ISSUES

1.      Whether FERC's rejection of the SPP tariff amendment departed from the cost-causation mandate and violated FERC's statutory obligation to approve "just and reasonable" rates. 16 U.S.C. §824d(a), (e).

2.      Whether FERC's reversal of its approval of SPP's tariff amendment and departure from Commission policy providing organizations like SPP discretion regarding cost allocation without reasoned explanation was arbitrary and capricious.

## STATEMENT OF THE CASE

## I.      Statutory and Regulatory Background

Congress enacted the FPA to regulate the transmission and sale of wholesale electricity.  Through the FPA, Congress charged FERC with ensuring that electricity rates are "just and reasonable" and not "unduly discriminatory or preferential."  16 U.S.C. §§824d(a), 824e(a).  That charge applies to "all rules and regulations affecting or pertaining to such rates," including contracts and tariffs "which in any manner affect or relate to [wholesale] rates, charges, classifications, and services." *Id.* §824d(a), (c).

FERC examines rates and schemes "upon complaint or on its own initiative, when a new or altered tariff or contract is filed" with the Commission for review, "or after a rate goes into effect."  *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 171 (2010).  Two FPA sections govern that process.  Under FPA §205, regulated utilities can file tariffs and amendments addressing a host of issues, including rates, cost allocation, and more.  16 U.S.C. §824d.  FERC must approve such tariffs and amendments if they are "just and reasonable" and do not "unduly discriminate against any consumers."  *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 4

6

(D.C. Cir. 2002) (citing 16 U.S.C. §824d(a), (b)).  Under FPA §206, FERC reviews, on its own motion or upon complaint, rates and schemes that appear to be unjust, unreasonable, or unduly discriminatory.  16 U.S.C. §824e.  If FERC finds that a rate or scheme is "unjust, unreasonable, unduly discriminatory or preferential," it must provide a remedy.  *Id.* §824e(a); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016).

In furtherance of its statutory duties, FERC has encouraged and approved the creation of Independent System Operators ("ISOs") and Regional Transmission Organizations ("RTOs").  *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 536-37 (2008).  These independent entities manage the energy transmission grid across the United States, help set rates through tariffs, and ensure that costs are allocated equitably.  *NRG Power Mktg.*, 558 U.S. at 169 n.1.  This case involves SPP, an RTO established in 2004 that now provides electric transmission services across a 14-state region covering portions of Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, and Wyoming.  *See* JA38.  Within the SPP region, numerous utilities operate in different zones—the geographic areas containing each utility's facilities.  Petitioners Sunflower Electric Corporation ("Sunflower") and Midwest Energy, Inc. ("Midwest Energy") are two utilities that both operate in their own zones in Kansas.  Notably, while SPP coordinates the

transmission of energy throughout the region, it does not decide what mix of energy will be generated.  Neither does Sunflower or Midwest Energy.  Those decisions are instead made by the generators who serve the region.  And those generators—not Sunflower or Midwest Energy—receive the revenue from the sale of the energy they generate.

When RTOs establish or alter the terms of their tariffs, they typically do so by engaging in a stakeholder process that considers the views of the various States, rate payers, utilities, and other impacted entities in the region.  The Commission, in turn, "accord[s] an appropriate degree of deference" when determining whether RTO proposals that have undergone stakeholder review and approval are just and reasonable. *Sw. Power Pool, Inc.*, 127 FERC ¶61,283, ¶33 (2009); *New Eng. Power Pool*, 105 FERC ¶61,300, ¶34 (2003); *Policy Statement Regarding Regional Transmission Groups*, 1991-1996 FERC Stats. & Regs., Preambles ¶30,976, at 30,872 (1993).

In 2011, FERC adopted amended rules for transmission planning and cost allocation through the issuance of Order No. 1000.  *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶61,051 (2011).  Among other things, Order No. 1000 enshrined the long-standing "rule that, in order to ensure just and reasonable rates, FERC" and the RTOs it regulates "must make some reasonable effort to match costs

to benefits." *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1263 (D.C. Cir. 2018).    That foundational principle, known as the "cost-causation principle," demands that "[t]he cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits." *Id.* at 1256.    FERC reaffirmed that principle just this year. *See Building for the Future Through Electric Regional Transmission Planning and Cost Allocation*, Order No. 1920, 187 FERC ¶61,068, ¶280 (2024) (customers should pay "only to the extent that *they* benefit from those facilities and, even then, any share they pay for must be roughly commensurate with the benefits they receive").

## II.    Factual Background

### A.    The "Highway/Byway" Cost-Allocation Scheme

In 2010, SPP proposed (and FERC approved) a comprehensive cost-allocation plan for transmission within the region. *Sw. Power Pool, Inc.*, 131 FERC ¶61,252 (2010), *order on reh'g*, 137 FERC ¶61,075 (2011).    Known as the Highway/Byway methodology, that plan permits SPP to allocate the costs of transmission facilities either to the SPP region as a whole (regional cost allocation) or to the local zone where a facility is located (local zone cost allocation) based on the voltage level of the transmission facility. *Id.* ¶10. It splits cost allocation into three categories.    For transmission facilities with a voltage level of 300 kilovolts or more (Highway

9

facilities), SPP allocates 100% of the costs on a regional (or postage-stamp) basis. *Id*. For those with a voltage level between 100 and 300 kilovolts (Byway facilities), SPP allocates 33% of the costs on a regional basis and 67% to their local zone. *Id.* And for those at 100 kilovolts or less, SPP allocates 100% of the costs locally. *Id.*

The Highway/Byway methodology was developed, analyzed, reviewed, and approved during a time when renewable energy was far less prevalent than it is today. *See* JA46. The methodology was therefore based on SPP's pre-2010 transmission analyses of traditional generation sources (gas and coal), which demonstrated that higher-voltage facilities (greater than 300 kilovolts) typically contributed more to transmission transactions that crossed one or more zonal boundaries, fulfilling more of a "[h]ighway" function in support of the region. *Sw. Power Pool, Inc.*, 131 FERC ¶61,252, ¶¶72-74. Conversely, those same analyses demonstrated that lower-voltage facilities typically supported local zones where they were situated, like a local "[b]yway" road. *Id.* Accordingly, it made sense at the time (nearly 15 years ago) from a cost-causation perspective to allocate costs regionally for all Highway facilities and mostly locally for all Byway facilities.

## B.    A Change in the Wind

The construction and use of renewable wind-energy generation has increased dramatically nationwide since 2010. And in more recent years, it has seen particularly significant growth in the SPP region, some parts of which (on account

of their geography) make up a substantial portion of the nation's wind energy resources. *See* FERC Off. of Energy Pol'y & Innovation, *2023 State of the Markets* 4 fig. 2 (Mar. 21, 2024) (recording wind energy increase in SPP region) ("FERC 2023 Market Report"), https://rb.gy/lv9sk7. In the six years between 2014 and 2020, for example, total wind capacity and wind generation output in the SPP region tripled. Sw. Power Pool Mkt. Monitoring Unit, *State of the Market 2020*, at 1 (Aug. 12, 2021) ("SPP 2020 Market Report"), https://rb.gy/akpxns. As of 2020, wind comprised about 29% of the installed energy capacity in the SPP market, ahead of coal (24%) and not far behind natural gas (39%). *See* JA46 (citing *id.* at 1). Wind today represents "the largest portion of total energy produced" in the SPP region. SPP 2020 Market Report 1. And it continues to grow. *See, e.g.*, FERC 2023 Market Report 4.[1] That is not a product of independent choices by Kansas or Petitioners; it is the power generation companies in SPP that determine the mix of resources to develop to best serve the region. And while SPP is agnostic as to which resources serve the region, it has necessarily supported increased wind transmission given the larger reliance on cost-effective renewable wind generation across the SPP region.

---

[1] *See* Sw. Power Pool Mkt. Monitoring Unit, *State of the Market 2022*, at 2 (May 15, 2023), https://rb.gy/zb3w95 (noting in the latest full market reporting that "[w]ind resources" had the "highest percentage in 2022 at nearly 38 percent of total generation, with coal resources producing just over 33 percent of total generation"); Sw. Power Pool Mkt. Monitoring Unit, *State of the Market Fall 2023*, at 2 (Feb. 12, 2024), https://rb.gy/o1jy6c (noting same in latest quarterly report).

Unlike its more traditional counterparts (gas and coal), however, wind power is generated in significant quantities only in certain areas of the SPP region where wind is plentiful. These wind-rich areas typically produce far more wind energy than can be consumed on a local basis. Kansas, where Sunflower and Midwest Energy operate, is a prime illustration. *See* JA46-48. In Kansas, the capacity of wind energy available for generation and delivery across the SPP region exceeds the "peak" local demand by 200%. JA46. That mismatch between local supply and demand has significant consequences for the allocation of transmission costs in the SPP region, as it means that SPP transmission facilities must deliver a substantial amount of wind energy generated in Kansas to the rest of the SPP region to meet the region's needs. This "increased loading" on transmission facilities delivering wind power generated in Kansas (and other wind-rich zones) across the SPP region leads certain Byway facilities to play a regional (not local) role in moving power. JA46.

But because the Highway/Byway cost allocation methodology is based on voltage level, without regard to regional benefits, each wind-rich area bears the lion's share (67%) of the costs for Byway facilities, even if certain of those transmission facilities primarily export wind energy regionally. JA46-49. To take Petitioners as an example, Midwest Energy and Sunflower customers faced 2022 Byway costs of $814 and $1,430 per megawatt month, respectively—compared with a load-weighted average of $427 for other SPP zones—in part because they are shouldering

the increased cost of transmitting wind energy to the rest of the region.  *See* JA472.

The Highway/Byway methodology therefore provides a financial windfall to

customers in wind-poor zones who benefit from that wind energy while paying only

a fraction of the costs of transmitting it, and a substantial financial burden to those

living in windy cities who pay the bulk of the cost of transmitting energy they are

not using.

### C.     Stakeholder Review and Recommendations

In 2017, at Petitioners' request, SPP undertook an extensive stakeholder

process to analyze and determine how best to ameliorate that cost-benefit imbalance.

As part of that process, SPP's Regional State Committee—composed of several state

representatives who are state utility regulators positioned to advise on matters of

regional importance—directed a working group to work with SPP staff and

stakeholders as it relates to issues of cost allocation.  JA48-49.

The SPP Board also established a dedicated team to study the imbalance and

make recommendations to the Regional State Committee and its working group on

potential solutions.  JA38-39.  That dedicated team—the Holistic Integrated Tariff

Team—comprised 15 diverse stakeholders, including Board members, state

regulators, and representatives of numerous stakeholder sectors within SPP.  JA38-

39.  The undertaking culminated in a report that, as relevant here, recommended

various solutions to the Highway/Byway cost imbalance.  JA40.  After reviewing the

report and other recommendations, in addition to several others "prepared by SPP staff, stakeholders and [working group] members," the Regional State Committee's working group ultimately "determined that the current cost allocation methodology … is not reflective of cost causation principles." JA49.

Over July and August of 2019, the SPP Board and the Regional State Committee approved various recommendations to address the cost imbalance problem. JA49. One was for SPP to propose a "narrow and limited" amendment to the Highway/Byway system whereby waivers could be sought for costs of Byway facilities to be allocated on a 100% regional basis (as opposed to the current 67% local and 33% regional split), in order to better align the costs and benefits of transmitting wind energy. JA40. The proposal was modeled after two FERC-approved waiver processes: the base plan upgrade waiver process and the transformer waiver process. The former allows transmission customers to seek a waiver from SPP related to certain network upgrade costs and gives SPP a reasonable "degree of flexibility in making cost allocation determinations." JA61. The latter allows entities to request that new transformer costs be allocated "based on the anticipated utilization of the transformer" and permits SPP to evaluate requests based on a flexible set of criteria and approve or deny applications at its discretion. JA72. SPP's Byway facility waiver proposal, which mirrored those two approaches, underwent years of stakeholder review and garnered widespread approval from

various groups, including the Regional Tariff Working Group, the Markets and Operations Policy Committee, the Regional State Committee, and the SPP Board. JA38-41.

## III.   Procedural Background

### A.   FERC's Rejection Order

On April 14, 2021, SPP initiated an FPA §205 proceeding before FERC and filed its tariff amendment outlining the Byway facility waiver proposal.   JA41. Although FERC acknowledged the "cost allocation issues associated with the increasing amount of renewable generation in the SPP region," it initially rejected the amendment without prejudice on two grounds.   JA32, ¶38 ("Rejection Order").

First, FERC expressed concern that "SPP's proposal grants the SPP Board too much discretion in allocating the costs" and lacked "objective standards, criteria, or thresholds for the SPP Board's decision whether to approve or deny a waiver."   JA33, ¶39.   Second, FERC expressed concern "that the proposed waiver process lack[ed] transparency because [it] do[es] not indicate that SPP would document and provide an explanation about how SPP, the relevant committees, and the SPP Board would evaluate the information provided by applicants and reach their conclusions about whether to approve (or recommend approving) a request."   JA33, ¶40.   But in recognition of SPP's robust stakeholder process and the serious cost-allocation concerns SPP's proposal sought to address, FERC advised SPP to file "a revised

15

proposal that remedies the identified deficiencies, and encourage[d] SPP's continued efforts to proactively address these issues."  JA35, ¶42.

### B.    SPP's Updated Tariff Amendment

SPP did exactly that.  On May 10, 2022, after another year-long stakeholder process wherein it developed numerous revisions that were reviewed and approved by several stakeholder groups, SPP filed an updated tariff amendment with FERC addressing its two concerns.  *See* JA82-87.  First, SPP curtailed the Board's discretion by outlining three objective criteria an applicant must satisfy to obtain a waiver:  a "Capacity Criterion," a "Flow Criterion," and a "Benefit Criterion." JA83-84.  "The Capacity Criterion identifies the Zones with excess [wind] generation unaffiliated with load in the Zone, the Flow Criterion identifies the Byway Facilities within those Zones that serve the region [as opposed to the locality] because they are used primarily to support transfers of energy [outside the Zone], and the Benefit Criterion ensures that these Byway Facilities produce substantial benefits to load outside the Applicant's Zone."  JA56.[2]  The bar to satisfy each is high:

- To satisfy the Capacity Criterion, an applicant must show that there is a significant capacity surplus in the zone where the facility is or will be located that is unaffiliated with the local zone that exceeds the prior year's peak load (or energy usage) in the zone.  JA83.  Currently, only three zones would qualify.  JA53.

---

[2] Although the proposal was prompted by an uptick in wind energy, it is resource agnostic, to accommodate unforeseen increases in other resource generation.

- To satisfy the Flow Criterion, an applicant must show that over 70% of the projected energy flow on a Byway facility will be attributable to resources unaffiliated with the local zone, and thus utilized for regional use. JA53-55. Currently, only 34 facilities would pass muster. JA55.

- To satisfy the Benefit Criterion, an applicant must show that a facility will provide substantial benefits to the region, rather than the locality. JA55-56. The evaluation of benefits can be based on either "adjusted production cost savings and/or savings through the Integrated Marketplace." JA55.

SPP expected that including these stringent limitations on its discretion would improve the waiver process and fully address FERC's concerns, especially considering that FERC had approved more flexible protocols for RTOs and ISOs in the past. *See, e.g.*, *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶61,103, ¶¶26, 28 (2003) (permitting ISOs discretion to depart from FERC-mandated tariff provisions under "more flexible" "'independent entity variation' standard"); *Improvements to Generator Interconnection Procedures and Agreements*, Order No. 2023, 184 FERC ¶61,054, ¶10 (2023) (reaffirming "independent entity variation standard" and additional discretion for ISOs); *see also supra* p.14.

Second, SPP introduced several procedural steps to maximize transparency. Under the revised amendment, SPP must post each waiver application on its public website, subject to necessary industry protections. JA85. SPP staff must then "provide a written recommendation and rationale regarding the approval or denial of the waiver request" to the SPP Board, the Regional State Committee, the

Committee's working group on cost allocation, and others. JA85. The working group then provides its recommendation to the Regional State Committee, which "vote[s] to recommend approval or denial of the waiver request" to the SPP Board. JA85. All of this is subject to public notice and comment. JA85-86. Thereafter, a public meeting is held where the working group and any interested parties who submitted public comments can present to the SPP Board and the Committee. JA86. Finally, after reviewing all the data, the SPP Board votes on the waiver request. JA86-87. The Board vote (like all SPP Board votes) is by secret ballot, as required by Board policy to ensure all members vote freely. SPP, Governing Documents Tariff, §4.6.3. But all analyses, recommendations, meeting minutes, and documentation must be posted publicly, subject only to confidentiality concerns. JA321-22, ¶37 ("Approval Order") (citing JA150-51).

### C.    FERC's Approval Order

On October 28, 2022, FERC approved SPP's updated tariff amendment, concluding that the revised proposal fully addressed its discretion and transparency concerns.

At the outset, the Commission found that SPP's proposal "will help ensure that the costs of Byway facilities are allocated in a manner that is at least roughly commensurate with estimated benefits, consistent with the cost causation principle." JA325, ¶48. That was so, FERC explained, because satisfying the "Capacity, Flow,

18

and Benefit Criteria" demonstrates "that the Byway facility is primarily used to transmit energy outside the zone where the facility is located and provides significant benefits to other zones in the SPP region."   JA326, ¶48; *see also* JA325-26, ¶48; JA326, ¶48 n.106 (recognizing that "Byway Facilities thus confer a benefit to all load in SPP because they are used to export low-cost renewable energy out of the host Zone").   Quoting Order No. 1000, FERC underscored that "*[c]osts may not be involuntarily allocated to entities that do not receive benefits*."   JA325, ¶48 n.104. FERC concluded that, because the three criteria "show[]" that a Byway Facility provides "significant benefits to [other] zones," "SPP's proposal will better align the allocation of the costs of the Byway facility with its beneficiaries."   JA326, ¶48.

FERC then determined that "SPP's proposal addresses the concerns related to discretion that the Commission articulated in the Rejection Order."   JA328, ¶53. FERC explained that the Capacity, Flow, and Benefit criteria "limi[t]" the SPP Board's discretion and are "justified" and "clear."   JA326-29, ¶¶50, 53.   Accordingly, FERC "no longer [had] concerns that the proposal gives SPP too much discretion in making cost allocation decisions."   JA329, ¶53.   As to the "Benefit Criterion" in particular, FERC found that "it is reasonable for SPP to analyze benefits based on adjusted production cost savings and/or savings through the Integrated Marketplace, as the Commission has previously accepted cost allocation proposals based on these types of transmission facility benefits."   JA327, JA331-32, ¶¶51, 61.

Second, the Commission found that "SPP's proposal addresses the concerns … in the Rejection Order regarding transparency." JA328, ¶52. SPP's revisions, FERC concluded, clearly outline the "application process," require a "written recommendation and rationale regarding the approval or denial," specify "procedures for documenting and explaining SPP's analysis and recommendations," and ensure public posting of all proceedings. JA328, JA330, ¶¶52, 56.

FERC therefore approved the waiver process subject to a compliance filing by SPP to address two minor points. JA329-30, ¶¶54-55. First, to further limit SPP's discretion, the Commission directed SPP to alter the Benefit Criterion to *mandate* that applicants quantify benefits using only adjusted production costs or savings through the Integrated Marketplace, instead of just *permitting* them to use either or both of those two methods. JA329, ¶54. By doing so, FERC ensured that the SPP Board would have no discretion "to consider alternative methods for calculating benefits." JA329, ¶54. Second, the Commission directed SPP to include language in the amendment clarifying that its waiver decision would be based "solely on whether the Capacity, Flow, and Benefit Criteria are satisfied, consistent with SPP's stated intent." JA330, ¶55.

Two Commissioners dissented. Commissioner James Danly acknowledged that the question of "who pays" is the "single" most "important" one for FERC to grapple with but expressed concern that the proposed tariff amendment still gave the

SPP Board "too much discretion." JA333, ¶¶1-2 (Danly, dissenting). He also observed that some States that do not have renewable energy policies voted against SPP's proposal and hypothesized that maybe they were concerned about paying for policies adopted by other States, although he acknowledged that no States actually voiced any such concerns before FERC. JA333-36, ¶¶2-6. And he repeatedly noted his opposition to "socializ[ing] the costs of 'Byway' transmission projects" that are needed to "accommodate new wind resources." JA333-36, ¶¶2-6. Commissioner Mark Christie, for his part, complained that the proposal had obtained only super-majority, not unanimous, approval in the Regional State Committee. JA337-40, ¶¶2-5 (Christie, dissenting).[3] And he too lamented that more States did not opt to participate in the FERC proceedings and air any potential concerns with purportedly paying for the supposed policy choices of other States. JA337-40, ¶2-5. In response, the majority highlighted the extensive stakeholder process through which the proposal was approved, noted that seven of the eight SPP States that have no renewable standards voted in favor of the proposal, and emphasized that the amendment permits costs to be allocated regionally only if a facility provides a substantial regional benefit. JA326, ¶49.

---

[3] SPP's Bylaws have never required a unanimous vote by the Committee to approve a revised cost-allocation method. *See* SPP, Reg'l State Comm. Bylaws, Art. IV, §8(c) (2017) (providing for majority vote).

SPP promptly submitted the compliance filing FERC requested.  *See* JA358, JA361 ("Compliance Filing").  In reliance on FERC's Approval Order, SPP then implemented the Byway facility waiver process.  *See* JA476.  Soon thereafter, Sunflower submitted a waiver application (the only one to date).  JA476-77.  SPP staff recommended approval of Sunflower's application to the Regional State Committee's working group, which approved it.  JA477 & n.86.  The Committee then set a meeting on July 24, 2023, to review and vote on the application, but before it could do so, everything changed.  JA477.

### D.    FERC's Reversal Order

On July 13, 2023, nearly a year after approving SPP's tariff amendment, and following a change in its composition, FERC reversed course and rejected SPP's proposed tariff amendment in toto.  *See* JA423-45 ("Reversal Order").  In doing so, FERC did not identify any new or different concerns with the amendment's waiver process; nor did it discuss the cost-causation principle or its prior findings about cost imbalances in the region.  Instead, FERC did an about-face on the exact same issue it had already resolved, now claiming that the tariff amendment actually does grant "the SPP Board too much discretion."  JA443, ¶50.  After having previously reached the opposite conclusion, FERC now held that basing a waiver decision exclusively on the "Capacity," "Flow," and "Benefit" criteria is not enough because "there is no proposed requirement for the SPP Board to approve the request if the Byway facility

satisfies the" criteria. JA443, ¶51. And rather than simply ask SPP to address that perceived deficiency, as it had done when confronting concerns in the past two proceedings, FERC declared that defect fatal, insisting that the entire waiver process was "unduly discriminatory" given this purported "potential for disparate treatment." JA444, ¶52. FERC also found that its other compliance directive regarding the Benefit Criterion was deficient because of yet another previously uncited "potential for disparate treatment." JA444, ¶52. Allowing applicants to satisfy the Benefit Criterion in one of two ways (through either adjusted production cost savings or savings in the Integrated Marketplace) was, according to FERC, "unduly discriminatory." JA444, ¶52.

The Commission acknowledged that "the RTO/ISO model provides an element of discretion to an RTO/ISO's board of directors" in various respects. JA444-45, ¶54. But it puzzlingly resuscitated the Rejection Order's claim that SPP's initial proposal is "more expansive" than the discretionary transformer waiver process FERC has approved because "all ... Byway facilities [are] eligible to *request* a waiver." JA444, ¶53 (emphasis added). Under the Capacity, Flow, and Benefit criteria, however, very few facilities can *obtain* a waiver. *See supra* pp.16-17. Under SPP's revised tariff amendment, therefore, "clear standards" govern when waivers may be granted—directly addressing FERC's scope concern in the Rejection Order. *See* JA33, ¶39. FERC also complained that SPP's proposal gives its Board discretion

23

"to change which cost allocation method applies to specific Byway facilities after they have been selected as a Byway facility," JA445, ¶54—again without acknowledging how limited the scope of that discretion is or citing anything for that proposition.

This time, Commissioner Danly authored a concurrence, in which he insisted that the waiver process would vest SPP with "unfettered discretion" and reiterated his opposition to "socializing" the cost of transmitting wind energy throughout the SPP region. JA446 (Danly, concurring). Commissioner Christie also authored a concurrence, reiterating his preference that any future proposal have unanimous state consent (which, again, is not required under SPP Bylaws). JA447, ¶2 (Christie, concurring).

### E.    FERC's Rehearing Order

Petitioners sought rehearing, which FERC denied. *See* JA485 ("Rehearing Order"). The Commission acknowledged that the Capacity, Flow, and Benefit "criteria *must* be met in order for the SPP Board to approve a requested reallocation," and that "SPP has stated the proposal is not intended to allow for unduly discriminatory results." JA496, JA504, ¶¶29, 41 (emphasis added). But FERC nevertheless insisted that discriminatory results "are, in fact, allowed under SPP's proposal." JA504, ¶41. FERC added that its concerns about discretion were

24

"elevated" because the Board is not required under the proposal to "set out its decision to grant or deny" a waiver request in writing. JA499, ¶32.

FERC also "reiterate[d]" its acknowledgment of past "precedent" that afforded RTOs and ISOs significant discretion when it comes to cost allocation but maintained that the Reversal Order did not "r[un] afoul" of it. JA497, ¶30. In addressing that precedent, FERC cited—for the first time in these years-long proceedings—Order No. 1000's requirement "that *ex ante* cost allocation methods must be known 'in advance.'" JA497, ¶30. According to FERC, SPP's proposal transgresses that requirement because it "would provide the SPP Board with the discretion to change which cost allocation method applies to specific Byway facilities after they have been selected as a Byway facility." JA497-98, ¶30. FERC asserted that past practices like SPP's base plan upgrade waiver process, in contrast, are "not subject to Order No. 1000's *ex ante* cost allocation requirement" because they do involve "regional transmission facilities selected in SPP's regional transmission plan for purposes of cost allocation." JA498, ¶31. But just two paragraphs later, FERC admitted that "the Base Plan Upgrade waiver process" *does* "relate to regional transmission cost allocation." JA499, ¶33.

Finally, FERC dismissed Petitioners' arguments that the existing Highway/Byway cost allocation is unjust and unreasonable as "misplaced" in an FPA §205 proceeding. JA501, ¶37. According to FERC, such challenges to existing

schemes must be raised in a §206 proceeding.  JA501, ¶37.  Nonetheless, FERC

declined Petitioners' request that FERC initiate a §206 proceeding, noting only that

it was "not persuaded … to exercise that discretion" here.  JA505, ¶43.  FERC did

not deny or otherwise retreat, however, from its previous acknowledgment that a

serious cost imbalance does in fact exist.

In a separate concurrence, Chairman Willie Phillips and Commissioner Alison

Clements stated that they were "sympathetic" to the parties' concerns, acknowledged

that FERC's own decisions "have caused parties to spend considerable resources

over several years, without a solution to the deeper cost allocation challenges that

prompted SPP's filing," and expressed "understand[ing]" of the parties' request for

a §206 proceeding.  JA507, ¶2 (Phillips & Clements, concurring).  They then

inexplicably advised SPP to undertake a stakeholder process to address the problem.

JA507-08, ¶¶3-4.

Having already undertaken a stakeholder process that produced a widely

supported solution that FERC initially encouraged and approved, Sunflower and

Midwest Energy petitioned this Court for review of FERC's Reversal and Rehearing

Orders.  The Court subsequently consolidated the various petitions into this appeal.

## SUMMARY OF ARGUMENT

FERC's statutory mandate is to ensure that rates are just and reasonable.  As

both this Court and FERC have recognized repeatedly, that demands compliance

with the cost-causation principle—*i.e.*, the rule that customers' energy costs must be roughly commensurate with the benefits they receive. Yet when FERC confronted a cost-causation problem and a cost-causation solution in these proceedings, it chose to reject the solution in favor of perpetuating the problem. That is not an option open to FERC under the FPA, the APA, or this Court's precedent.

FERC initially recognized as much, and so worked collaboratively with SPP for years to adjust SPP's targeted waiver solution to ensure that it could be deployed to remedy the acknowledged cost imbalance that the significant increase in wind generation has produced in parts of the SPP region. But everything suddenly changed nine months later, when a newly-constituted FERC pulled a regulatory 180 and rejected the product of SPP's six-year stakeholder process in toto. FERC, like any agency, is entitled to change its mind when confronted with new facts or circumstances. But FERC cannot simply ignore the cost-causation principle that undergirds the FPA's just and reasonable regime, let alone reject a tariff amendment that ensures compliance with it. And when FERC summarily rejects its own findings and conclusions, it must at the very least explain *why* it is reversing course.

FERC did none of that here. It never confronted the reality that it was leaving in place, or in fact, re-imposing, a cost-allocation regime that admittedly flouts the cost-causation principle as to certain facilities, instead effectively deeming that a problem for another day. FERC insisted that it need not explain why it was

27

abandoning findings and conclusions made less than a year earlier on a virtually identical regulatory record.  It nowhere acknowledged the serious reliance interests that its encouragement and active participation in SPP's effort to remedy the cost-imbalance had engendered.  In place of a reasoned explanation for jettisoning both its work and SPP's, FERC offered only picayune complaints about a theoretical risk of "undue discrimination" that ignores the text of SPP's tariff amendment and flies in the face of SPP's representations to FERC.  And FERC's scant efforts to justify its departure from its own past precedents approving processes, which afford RTOs and ISOs discretion in allocating costs, do not even make sense on their own terms.

All of that is problematic enough, and readily suffices to warrant vacatur and remand.  But FERC's abject failure to abide by its FPA and APA obligations is especially troubling given the resistance expressed by some Commissioners throughout these proceedings to spreading the costs of transmitting wind energy throughout the SPP region.  FERC *must* ensure that the cost of transmitting energy is spread equitably among those who are benefitting from it, no matter what kind of resource is at issue.  The cost-causation principle demands nothing less.  If FERC thinks that a deviation from that principle is warranted, then it is incumbent on FERC to come out and say so, not ignore its own findings and conclusions and hide behind speculative claims of "undue discrimination" that find no purchase in fact or law.

28

FERC's failure to do so violates its statutory duties and is arbitrary and capricious. The Court should vacate and remand.

## STANDING

Petitioners Sunflower and Midwest Energy are utilities in the SPP region, were parties to SPP's stakeholder process and the administrative proceedings below, and are aggrieved by FERC's rejection of SPP's tariff amendment. Vacating the Reversal and Rehearing Orders would redress Petitioners' injuries. *See Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112-13 (D.C. Cir. 2001).

## STANDARD OF REVIEW

This Court "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §706(2)(A), (C). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

ARGUMENT

I.    **FERC's Reversal And Rehearing Orders Violate The Cost-Causation Principle And The Agency's Duty To Ensure Just And Reasonable Rates.**

This Court has long held that FERC has an obligation to ensure that rates comply with the cost-causation principle.  FERC's actions here run afoul of that settled rule.  FERC acknowledged a glaring cost-causation problem and expressly found that SPP's proposed tariff amendment would restore just and reasonable rates—yet FERC then rejected the proposal anyway.  Whatever discretion FERC may have under the FPA, it cannot reject just and reasonable tariff amendments, or re-impose cost allocations that it has recognized are creating a cost-benefit imbalance.  By doing so, FERC flouted both the FPA and the APA.

A.    **FERC Is Statutorily and Regulatorily Bound to Ensure that Rates Comply with the Long-Standing Cost-Causation Principle.**

"As a federal agency, FERC is a 'creature of statute,' having 'no constitutional or common law existence or authority.'"  *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002).  Accordingly, it possesses, and may wield, only "'those authorities conferred upon it by Congress.'"  *Id.*  And where a "delegation of the power … is accompanied by standards … FERC, as delegate, must conform."  *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1501 (D.C. Cir. 1984).  Agency action that violates its governing statute is "plainly contrary to law and cannot stand."  *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001); *see also* 5 U.S.C. §706(2)(C).  So too

30

with agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. §706(2)(A).

Pursuant to its statutory mandate, FERC *must* approve a tariff amendment if the proposed terms are "just and reasonable." *Atl. City Elec. Co.*, 295 F.3d at 9 (quoting 16 U.S.C. §824d(e)).  Conversely, "if FERC sees a violation of [the just and reasonable] standard, it must take remedial action." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016).  "For decades, the Commission and the courts have understood [the 'just and reasonable' statutory standard] to incorporate a 'cost-causation principle'—the rates charged for electricity should reflect the costs of providing it." *Old Dominion*, 898 F.3d at 1255.  "[T]he cost-causation principle prevents regionally beneficial projects from being arbitrarily excluded from cost sharing—a necessary corollary to ensuring that the costs of such projects are allocated commensurate with their benefits." *Id.* at 1263.  That principle "add[s] flesh" to the "just-and-reasonable-rate requirement" and ensures that "burden is matched with benefit" in all rate schemes.  *Id.* at 1255-56.

In keeping with that understanding, FERC itself has recognized that "cost causation is the foundation of an acceptable cost allocation method" and enshrined it as the first of six principles necessary to ensure that cost-allocation plans are "just and reasonable."  Order No. 1000, 136 FERC ¶61,051, ¶¶603, 622, 626.  Thus, as countless courts have recognized, when FERC fails to abide by the cost-causation

principle, its actions violate both the FPA and the APA's prohibition on arbitrary and capricious action. *See, e.g.*, *Farmers Union*, 734 F.2d at 1504; *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1050-52 (D.C. Cir. 2022) (per curiam); *Consol. Edison Co. v. FERC*, 45 F.4th 265, 282-85 (D.C. Cir. 2022) (per curiam); *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 360-63 (5th Cir. 2023); *Ill. Com. Comm'n v. FERC*, 756 F.3d 556, 557-65 (7th Cir. 2014).

*Old Dominion* is illustrative. There, the Court vacated FERC's approval of a PJM plan that eliminated regional cost-sharing for certain high-voltage transmission lines in favor of a scheme that forced local zones to bear the costs for certain regionally beneficial transmission projects. 898 F.3d at 1264.[4] "Application of the cost-causation principle" was "simple" because one "critical point [was] undisputed: high-voltage power lines produce significant regional benefits within the PJM network, yet the amendment categorically prohibit[ed] any cost sharing for high-voltage projects." *Id.* at 1260. This Court held in no uncertain terms that FERC's failure to follow the cost-causation principle embodied in the FPA was arbitrary and capricious. *Id.* at 1264.[5]

---

[4] PJM is an RTO that started with *P*ennsylvania, New *J*ersey, and *M*aryland, and now includes 13 States and the District of Columbia.

[5] Because failure to abide by the cost-causation principle is arbitrary and capricious, no amount of deference can excuse it. That said, FERC should not be entitled to deference here. While this Court has held, based on *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), that FERC is

**B.    FERC's Rejection of SPP's Tariff Amendment Violates the Cost-Causation Principle Twice Over.**

FERC's Reversal and Rehearing Orders flout the cost-causation principle, both by rejecting a just and reasonable rate and by re-imposing an unjust and unreasonable rate.  FERC repeatedly acknowledged the cost-allocation imbalance that the increase in wind energy has created in SPP, and it expressly found that SPP's proposal would ameliorate it.  That should have been the end of the matter, as FERC is statutorily required to approve just and reasonable tariff provisions.  *See Atl. City Elec. Co.*, 295 F.3d at 9.  Yet when it came to the Reversal and Rehearing Orders, cost causation simply disappeared from the equation.  FERC did not even try to explain why it chose to jettison a cost-causation *fix*, produced by a six-year stakeholder process, in favor of a regime that virtually all acknowledge is no longer producing consistently just and reasonable rates.  FERC's actions thus violate its statutory mandate and are arbitrary and capricious.

---

entitled to deference even on purely legal questions, *see Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1568-69 (D.C. Cir. 1987), the Sixth Circuit has correctly recognized that courts should "defer to the Commission only when the Commission bases its interpretation on its factual findings or technical expertise," *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021) (internal quotation marks omitted).  The Supreme Court is currently considering whether to overrule or narrow *Chevron*, and Petitioners preserve all arguments that may arise from the resolution of those cases.  *See Loper-Bright Enters. v. Raimondo*, No. 22-451; *Relentless, Inc. v. Dep't of Com.*, No. 22-1219.

1.    As explained, the dramatic increase in wind-generation over the past decade has created inequities in SPP's Highway/Byway system.  *See supra* pp.10-13.  While SPP welcomes wind energy to serve the region, wind energy is generated in significant quantities only in certain SPP zones—zones that rarely have the energy demand to match the wind energy that unaffiliated generators in the zone supply.  Accordingly, some Byway facilities now serve a larger role in delivering wind power all across the SPP region, rather than primarily delivering local power to serve local needs.  And new Byway facilities are likely to be utilized primarily to handle the increased energy production.  But under the current regime, most of those facilities' costs will be allocated locally—even if the facility is used primarily to transmit excess wind energy to the rest of the region.  Thus, far from ensuring that "'burden is matched with benefit,'" the current scheme effects a "wholesale departure from the cost-causation principle" when it comes to wind energy, as it "'shift[s] a grossly disproportionate share of [the] costs'" of certain regionally beneficial wind projects "into a single zone."  *Old Dominion*, 898 F.3d at 1255, 1261.  And the problem is only growing more pronounced as wind generation continues to increase.

After years of stakeholder analysis, review, and approval, SPP proposed a surgical solution:  to slightly modify the Highway/Byway scheme by including a limited waiver process that would allow costs associated with Byway facilities to be allocated on a regional basis where such cost imbalances would otherwise exist.  *See*

*supra* pp.13-15.  SPP then spent another year working with stakeholders to devise concrete solutions to the concerns FERC initially expressed about the degree of discretion and transparency in the original proposal.  SPP carefully crafted criteria to cabin its discretion to grant waivers, requiring all applications satisfy "Capacity," "Flow," and "Benefit" criteria.  JA52-56.  And SPP maximized transparency through an elaborate review process with multiple avenues for participation by all interested parties.  With that plan in place, Byway facilities that satisfy SPP's demanding criteria could obtain a waiver that enables them to spread their costs across the region, thereby "ensuring"—consistent with the cost-causation principle—"that the costs of such projects are allocated commensurate with their benefits."  *Old Dominion*, 898 F.3d at 1263.

2.    From the outset, FERC acknowledged the legitimacy of SPP's cost-causation concern, noting the "cost allocation issues associated with the increasing amount of renewable generation in the SPP region" and "encourag[ing] SPP's continued efforts to proactively address these issues."  JA32, JA35, ¶¶38, 42.  And when FERC initially approved SPP's tariff amendment, it expressly found that it "will help ensure that the costs of Byway facilities are allocated in a manner that is at least roughly commensurate with estimated benefits, consistent with the cost causation principle."  JA325, ¶48.  As FERC explained, "SPP's proposal will better align the allocation of the costs of the Byway facility with its beneficiaries."  JA326,

35

¶48.  And FERC found, as to the particulars, that the proposal was sufficiently measured, transparent, limited in scope, and adequately cabined the SPP Board's discretion via the "Capacity, Flow, and Benefit Criteria" to eliminate any concerns about undue discrimination.  JA328-29, ¶53.

But nine months later, the Commission flip-flopped and retroactively rejected SPP's proposal.  "FERC is, of course, entitled to change its mind"—albeit not without "provid[ing] a 'reasoned explanation' for its decision to disregard 'facts and circumstances that' justified its prior choice," which "FERC failed to do" here. *MISO Transmission Owners v. FERC*, 45 F.4th 248, 264 (D.C. Cir. 2022); *see infra* Part II.  But it is not entitled to ignore how its decisions impact cost causation.  Yet the Reversal Order did not even discuss the cost-causation consequences of FERC's actions, let alone explain how re-imposing a system that is admittedly causing a serious cost imbalance could be just and reasonable.  And the Rehearing Order expressly *refused* to do anything about the Highway/Byway scheme's departure from cost-causation principles.  JA501-02, ¶37.  Indeed, the only other time those orders even *mention* cost causation is when acknowledging FERC's earlier finding that SPP's proposal would "help ensure" *compliance* "with the cost causation principle."  JA430, ¶16; JA489, ¶9.  And FERC nowhere backed away from that finding or even suggested that it was flawed, mistaken, or problematic.

FERC's wholesale failure to address—indeed, resolute refusal to consider—compliance with the cost-causation principle demands vacatur.  Just as in *Old Dominion*, the issue is not "a quibble about 'exacting precision,'" or "a tempering of the cost-causation principle in pursuit of 'competing goals.'"  898 F.3d at 1261.  FERC's Orders reflect a "wholesale departure from the cost-causation principle" in certain zones within the SPP region.  *Id.*  If anything, this case is *a fortiori* of *Old Dominion*, as FERC at least attempted to "reconcil[e] its orders with [the cost-causation] principle" there.  *Id.*  Here, by contrast, FERC expressly refused to even try to "justify its orders as a lawful departure" from cost causation or otherwise "reconcil[e]" the matter.  *Id.*  That failure is especially glaring given Commissioner Danly's (accurate) acknowledgment in his (otherwise flawed) dissent from FERC's Approval Order that, in this context, "there is no single question more important than who pays."  JA333, ¶2 (Danly, dissenting).  FERC's decision here is thus worse than others that ignored an "important aspect of the problem," *State Farm*, 463 U.S. at 43—here FERC ignored *the most important* aspect of the problem.  Because "FERC did not adequately justify its [denial] of [an] amendment" that it acknowledged would have remedied a glaring cost-causation problem, its decision must be set aside.  *Old Dominion*, 898 F.3d at 1263-64.[6]

---

[6] FERC did provide *some* reasons for its about-face, but those reasons were divorced from the cost-causation principle and in all events are arbitrary, capricious, and wholly unsupported by the record.  *See infra* Part II.B.

3.    At the very least, FERC violated its statutory mandate and acted arbitrarily and capriciously by re-imposing a cost-allocation scheme that the record and its own findings confirm is unjust and unreasonable because it produces "'wholesale departure[s] from the cost-causation principle.'" *Consol. Edison Co.*, 45 F.4th at 282.

The FPA mandates that "if FERC sees a violation of [the just and reasonable] standard, it must take remedial action." *Elec. Power Supply Ass'n*, 577 U.S. at 277. "More specifically, whenever the Commission 'shall find that any rate [or] charge'— or 'any rule, regulation, practice, or contract affecting such rate [or] charge'—is 'unjust [or] unreasonable,' then the Commission 'shall determine the just and reasonable rate, charge[,] rule, regulation, practice or contract' and impose 'the same by order.'" *Id.* (quoting 16 U.S.C. §824e(a)). "That means FERC has the authority—and, indeed, the duty—to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *Id.*; *Long Island Power Auth. v. FERC*, 27 F.4th 705, 709 (D.C. Cir. 2022); *Louisville Gas & Elec.*, 988 F.3d at 844. FERC cannot simply default to an inequitable status quo. Yet that is precisely what it did here.

Indeed, FERC all but acknowledged as much in the Reversal Order, where the concurring Commissioners highlighted the "deep[] cost allocation challenges" with the current scheme and expressed their "sympath[ies]" with SPP's attempt to address

them.  *See* JA507, ¶2 (Phillips & Clements, concurring).  But in the end, FERC threw up its hands, saying there was nothing it could (or would) do once it (inexplicably) deemed SPP's proposal deficient because this was a §205 rather than a §206 proceeding.  *See* JA501, ¶37.  That is plainly wrong.  The lone case FERC cited for that proposition *rejected* the argument that the "Commission must act within the confines of the utility's proposals" under §205.  *City of Winnfield v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984); *see also, e.g.*, *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 664 (D.C. Cir. 2017) (per curiam) (emphasizing "that the Commission's actions under the two sections 'need not be exercised in separate proceedings'").  And FERC worked collaboratively with SPP for years in this very proceeding to address concerns about discretion and transparency, belying any claim that the §205 posture precluded such collaboration.  FERC offered no explanation in the Reversal and Rehearing Orders for its refusal to continue that iterative process.  Nor did FERC explain why it now faulted SPP and Petitioners for trying to craft a *solution* to the cost-causation problem that reflected input and buy-in from a wide range of stakeholders, rather than jumping straight to a §206 filing asking FERC to fix it itself.  *See* JA32-35, ¶¶38-42 ("encourag[ing] SPP's continued efforts to proactively address these issues"); JA507-08, ¶¶3-4 (Phillips & Clements, concurring) (encouraging a stakeholder process).

In all events, FERC acknowledged that it *could* initiate a §206 proceeding; it just summarily declared that it was "not persuaded" to do so. JA505, ¶43. That is an insufficient explanation when FERC has openly acknowledged that the cost-allocation scheme the §205 proceeding was initiated to remedy is no longer just and reasonable in all circumstances. *See, e.g.*, *Consol. Edison Co.*, 45 F.4th at 278 ("FERC's ratemaking orders will not stand … if they are … 'inadequately explained.'"); *New Eng. Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 205 (D.C. Cir. 2018) ("If FERC agrees that the rate is unjust or unreasonable, it must establish a new rate."). FERC cannot simply "abdicate[] its statutory responsibilities in favor of a method that, by its own description," *Farmers Union*, 734 F.2d at 1503-04, is *not* "consistent with the cost causation principle," JA325, ¶48.

## II. FERC's "Undue Discrimination" Concerns Mark An Unjustified And Unjustifiable Departure From Past Commission Findings And Precedent And Find No Support In The Record.

Rather than focus on the cost-causation problem, FERC fixated on purported deficiencies in SPP's effort to solve it. But FERC nowhere explained why the very modifications *FERC itself had crafted* somehow failed to assuage the discretion and transparency concerns it crafted them to address. FERC's quibbles could easily have been remedied by a compliance filing, but FERC opted—without adequate explanation—to throw the baby out with the bathwater. Worse still, the concerns repeatedly expressed by the previously-dissenting-but-now-concurring

40

Commissioners about spreading the cost of transmitting wind energy throughout the region raise the troubling prospect that FERC was really trying to mask a refusal to abide by the cost-causation principle when it comes to renewable resources. But in all events, whatever FERC's motivation may have been, its paltry explanation for its departure from its previous findings and past precedent is insufficient, and its highly speculative concerns about "undue discrimination" do not begin to justify re-imposing a regime that is *actually* producing unjust and unreasonable rates.

### A.    FERC Failed to Adequately Explain Its About-Face or Address the Serious Reliance Interests That Its Actions Engendered.

1.    In these proceedings, FERC conducted a classic regulatory bait and switch. When SPP first introduced its tariff amendment, FERC lauded SPP's endeavor and signaled its intent to approve the proposal if SPP addressed specific concerns regarding the scope of its discretion and the transparency of the waiver process. *See* JA32-35, ¶¶38-42 ("recogniz[ing] and encourag[ing] SPP's efforts," noting that "rejection is without prejudice to SPP filing a revised proposal that remedies the identified deficiencies," and "encourag[ing] SPP's continued efforts to proactively address these issues"). SPP proceeded to do just that. SPP reconvened its stakeholders and, after another full year of working through the issues, crafted a set of objective standards to bind its discretion. The updated proposal also maximized transparency by requiring, *inter alia*, that applications be posted on SPP's public website, that SPP staff and other bodies "provide a written

41

recommendation and rationale regarding the approval or denial of the waiver request" to all decisionmakers, and that decisionmakers base their decision exclusively on clear and objective criteria. *See supra* pp.16-18.

In the Approval Order, FERC explained that it "no longer ha[s] concerns that the proposal gives SPP too much discretion" and that the proposal "addresses the concerns … regarding transparency."  JA328-29, ¶¶52-53.  And it directed SPP to make two minor alterations via a compliance filing for the specific purpose of minimizing any lingering risk of undue discrimination, which SPP promptly did. JA329-30, ¶¶54-55.  But FERC then flipped the tables, declaring that the changes it had demanded and approved to guard *against* discrimination "could" somehow "potentially" lead to "unduly discriminatory outcomes."  JA443, ¶51.

Again, "FERC is, of course, entitled to change its mind." *MISO Transmission Owners*, 45 F.4th at 264.  But "it must provide a 'reasoned explanation' for its decision to disregard 'facts and circumstances that' justified its prior choice."  *Id*. And it "must" provide an even "more detailed justification" for changing course when "its new [decision] rests upon factual findings that contradict those which underlay its prior [one]."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  "Here, FERC failed to do that."  *MISO Transmission Owners*, 45 F.4th at 264.  Indeed, FERC disclaimed any need "to establish that its newer position is superior to the Commission's earlier position." JA496, ¶29.

42

Time and again in the Reversal and Rehearing Orders, FERC based its conclusions on findings that are irreconcilable with those made in the Rejection and Approval Orders. Yet FERC offered not a single change in the facts or law that might justify abandoning those findings, much less "substantial evidence" to support its change of heart. *Cal. Pub. Utils. Comm'n v. FERC*, 20 F.4th 795, 800 (D.C. Cir. 2021). Nor did it identify any purported flaws in the Approval Order or even embrace any of the policy concerns expressed in the dissents. FERC simply reversed its position on the very same issues it had conclusively resolved less than a year earlier—discretion and transparency—without even bothering to explain why modifications FERC itself mandated were somehow no longer good enough to assuage any lingering discretion and transparency concerns.

For example, FERC purported to ground its newfound discretion concerns in its claim that the proposed waiver process does not include a provision that expressly "require[s] the SPP Board to approve a reallocation request if the criteria are met." JA443, ¶51. On that basis, FERC posited a risk that the Board might "deny [an application] where SPP staff has determined that the criteria are met or … approve" an application "where SPP staff has determined that the criteria are not met." JA443, ¶51; *see also* JA496, ¶29. That claim is inexplicable. By its terms, the amended tariff states: "For any waiver request submitted under Section III.E. of this Attachment J, the SPP Board of Directors' decision to approve or deny the waiver

43

request *shall be based solely* on whether the Capacity Criterion, Flow Criterion, and Benefit Criterion, as detailed in Section III.E.2, are *all* satisfied." JA361 (emphases added).

The inclusion of that language is no accident. FERC directed SPP to add it, to memorialize SPP's assurances that "the Board does *not* have the discretion to approve a request when one or more of the specified criteria have not been met or to substitute alternative criteria in lieu of those defined in the proposed Tariff language." JA330, ¶55 (emphasis added). FERC explicitly deemed that limitation sufficient to render the proposal "just and reasonable and not unduly discriminatory or preferential." JA330, ¶55. And SPP went beyond FERC's demands in its Compliance Filing by specifying that the criteria must "all" be "satisfied." FERC did not even try to explain in its Reversal and Rehearing Orders how the very same constraint it had imposed for the specific purpose of *eliminating* any lingering risk of discrimination no longer sufficed to do so. Nor did it offer any explanation for why this belated concern demanded rejecting the proposal in full rather than requesting minor modifications to further memorialize what SPP had already promised, as FERC did when confronting similar concerns in the Rejection and Approval Orders.

FERC also complained in the Reversal Order that the Benefit Criterion would allow the SPP Board to consider whether either or both of two types of benefits exist

44

("adjusted production cost savings" and "savings in the Integrated Marketplace"). *See* JA443-44, ¶52; JA503-04, ¶41. But, once again, that stems from FERC's own directives. FERC expressly instructed SPP to revise the amendment to state that "[t]he benefit *shall* be quantified in terms of adjusted production cost *and/or* savings through the Integrated Marketplace," thereby ensuring that SPP's discretion would be cabined to considering either or both of those two potential benefits. JA329, ¶54 (emphasis added). And, as SPP represented, while *applicants* may choose to quantify benefits using either or both methods, *the SPP Board* must approve the waiver so long as either or both is satisfied. *See, e.g.*, JA149-51.

FERC never even hinted before the Reversal Order that requiring the Board to consider two—and only two—metrics of benefits somehow provided it with so much discretion as to risk "undue discrimination." To the contrary, FERC expressly found it "reasonable for SPP to analyze benefits based on adjusted production cost savings and/or savings through the Integrated Marketplace." JA327-28, ¶51. Nor, once again, did FERC explain in either the Reversal Order or the Rehearing Order why this concern created an insurmountable obstacle to establishing a waiver process to restore balance.

FERC also claimed, for the first time in the Rehearing Order, that the purported risk of undue discrimination is "elevated" because the SPP Board does not have to provide a statement of reasons for granting or denying a waiver. JA499, ¶32.

45

Once again, that claim blinks reality. In direct response to FERC's concerns about insufficient transparency, SPP adopted a multi-step, public recommendation and approval process—with an initial recommendation from SPP staff, subject to review and recommendation by the Regional State Committee's working group, subject in turn to review and recommendation by the Committee itself (plus public comment from interested parties), and finally to approval or denial by the Board. *See supra* pp.16-18. Only after holding a public meeting will the SPP Board vote by secret ballot, as required by long-standing SPP policy, to ensure that the Board votes on merit and free from external pressures. JA360-61; SPP, Governing Documents Tariff, §4.6.3.

That is four layers of documented recommendations regarding approval or denial, and a final vote that is secret only because RTO policy mandates that *all* Board votes be secret. To suggest that such a process is so lacking in transparency as to create a risk of undue discrimination reflects a fatal mismatch "between the facts [in the record] and the choice made." *State Farm*, 463 U.S. at 43. As the Approval Order confirmed the first time around, the tariff amendment "provide[s] specific procedures for documenting and explaining SPP's analysis and recommendations." JA328, ¶52. FERC nowhere explained how there could be any serious risk of the Board simply ignoring the tariff amendment's limiting criteria in light of the multiple layers of public review—especially with §206 as a backstop if

that ever actually happened.  Nor did FERC cite anything in support of requiring the SPP Board to issue its own separate written explanation.  That is presumably because FERC has never demanded Board explanations in other contexts where the Board exercises discretion.  *See, e.g.*, JA346, JA353-55 (detailing transformer waiver process and base plan upgrade waiver process, neither of which requires a statement of reasons from the SPP Board).

To the extent FERC's real complaint is with the secrecy of the Board vote, there is a reason it did not mandate a change in that practice:  FERC "does not have the authority to reform and regulate the governing body of a public utility under the theory that corporate governance constitutes a 'practice' for ratemaking authority purposes."  *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 404 (D.C. Cir. 2004).  FERC cannot attack Board practices indirectly by rejecting a proposal because it complies with those practices.

2.     On top of all that, FERC made zero mention of the "serious reliance interests" that its own actions "engendered."  *Fox*, 556 U.S. at 515; *see also, e.g.*, *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").  FERC literally *invited* SPP's lengthy and costly stakeholder process, encouraging SPP to address the acknowledged cost imbalance in the region and work through concerns that

47

FERC assured could be assuaged.  *See, e.g.*, JA32-35, ¶¶38-42; JA329-30, ¶¶54-55.

And SPP did just that, producing a FERC-approved waiver application process that

was already in full force by the time FERC reversed course.  Yet at no point in its

Reversal or Rehearing Orders did FERC even mention "reliance interests," let alone

discuss SPP's extensive stakeholder process or acknowledge Sunflower's pending

waiver application.  That silence is particularly deafening given the concurrence's

acknowledgement that FERC's "decisions in this docket have caused parties to

spend considerable resources over several years," JA507, ¶2 (Phillips & Clements,

concurring), and the deference FERC customarily provides an RTO stakeholder

process, *see supra* p.8.

    In short, "the last time the Commission addressed for this very same tariff the

[very same] question ... the Commission gave the exact opposite answer."  *W.

Deptford Energy, LLC v. FERC*, 766 F.3d 10, 22 (D.C. Cir. 2014).  Yet FERC gave

no explanation for its change of heart.  "That is the very essence of unreasoned and

arbitrary decisionmaking."  *Id.*

## B.    FERC's Reversal and Rehearing Orders Mark a Deviation from Longstanding Agency Policy Without an Adequate Explanation.

    FERC also flouted the bedrock rule that agencies cannot "'treat[] similar

situations differently'" without at the very least "'display[ing] awareness'" of the

deviation and "'provid[ing] a reasoned explanation'" for it.  *Belmont Mun. Light

Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022).   As SPP and Petitioners

48

highlighted throughout the administrative proceedings, *see, e.g.*, JA61-62; JA461-66, and as the Commission acknowledged, FERC has a longstanding practice of vesting "RTOs/ISOs, … as *independent* entities, … with some discretion in making decisions related to transmission planning and cost allocation," JA331, ¶60 (emphasis added). That discretion is evident in, among other things, SPP's transformer waiver process, SPP's base plan upgrade waiver process, SPP's interregional projects process, and PJM's default resolution process. *See* JA61-62; JA461-66; *see also supra* p.14. Yet FERC balked here at a regime that would grant SPP far less discretion than those regimes, and instead seemed to embrace the remarkable proposition that RTOs cannot be trusted to exercise any independent judgment at all. FERC failed to adequately justify that stark departure from past practice, and its flimsy efforts to do so just underscore that its purported concerns about discretion and transparency are insubstantial—if not pretextual.

Take first the transformer waiver process, which permits the SPP Board to grant waivers allocating the cost of dual-voltage transformers based on their higher, rather than lower, voltage level. FERC tried to distinguish that practice on the ground that it is "relatively binary and appl[ies] only to a limited group of facilities," whereas SPP's proposal is "potentially … far-reaching [in] scope." JA444, ¶53. But in doing so, FERC fixated on the fact that SPP's proposal "would make all transmission projects that are designated as Byway facilities eligible to *request* a

waiver." JA444, ¶53 (emphasis added). It thus ignored what it takes for a facility to *obtain* one. Once the focus is correctly shifted to the constraints on SPP's power to *grant* a waiver, FERC's claim gets matters exactly backwards. The transformer waiver process entrusts SPP with wide discretion to evaluate requests based on a flexible set of non-exhaustive criteria. JA429, ¶13. SPP's tariff amendment, by contrast, confines SPP to three criteria and permits SPP to grant a waiver only if all three are satisfied. *Compare* JA346 (transformer waiver factors), *with* JA357-58 (Byway facility waiver criteria). And even if the number of eligible facilities were relevant, the record affirmatively refutes any claim that the number of facilities that could *obtain* waivers is "far-reaching in scope," as only three zones satisfy the Capacity Criterion. JA53.[7]

What little FERC had to say about the interregional projects process makes even less sense. As FERC acknowledged, Order No. 1000 vests ISOs and RTOs with "discretion … as to how transmission needs are identified, as well as how and whether transmission facilities, including interregional transmission facilities … are selected in the regional transmission plan for the purposes of cost allocation to meet those needs." JA497, ¶30. Again, FERC made no effort to distinguish the *degree*

---

[7] FERC made the same mistake with respect to the base plan upgrade waiver process, fixating in its Rehearing Order on the number of facilities eligible to *seek* a waiver while ignoring the constraints on SPP's power to *grant* one. *See* JA499, ¶53.

of discretion SPP and others have in that process.  Nor could it, as Order No. 1000 dictates that "[t]he substance of a regional transmission plan and any subsequent formation of agreements to construct or operate regional transmission facilities remain within the discretion of the decision-makers in each planning region." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 58 (D.C. Cir. 2014) (per curiam).  Consistent with that broad discretion, FERC leaves SPP free, *e.g.*, to assess interregional projects based on a flexible inquiry into whether "the benefits equal or exceed the costs for the SPP Region."  JA462 n.37.

Unable to explain how giving the SPP Board a measure of discretion on cost allocation is somehow more problematic than giving it broad discretion to select transmission facilities in the first place, FERC instead insisted that the projects process is somehow different because Order No. 1000 "provides that *ex ante* cost allocation methods must be known 'in advance.'"  JA497, ¶30.  That is a non-sequitur.  The *ex ante* principle has nothing to do with discretion.

Anyway, FERC's distinction is wrong.  The cost-allocation *method* is known in advance under SPP's proposal too:  SPP may grant a waiver only if an application satisfies all three limiting criteria.  *See* JA357-58.  To be sure, it cannot be known in advance precisely how often an application will do so.  But that is a product of fluid facts on the ground, not of some broader degree of discretion on SPP's part here than in the rest of the planning and cost-allocation process.  What is more, the proposed

51

tariff gives parties only a 180-day window after a future transmission facility receives a "Notification to Construct"—but before the facility is constructed—to apply for a waiver to allocate costs entirely regionally upon a showing that the facility's beneficiaries are largely regional, rather than local. *See* JA358. Cost allocation is therefore determined upfront for all future transmission facilities.

FERC did not dispute (or even acknowledge) that reality; it instead complained that the amendment would give SPP discretion "to change which cost allocation method applies to specific Byway facilities after they have been selected as a Byway facility." JA497-98, ¶30. To be sure, the amendment would also give existing facilities a brief window during which to seek a waiver. But FERC has never interpreted the *ex ante* principle to foreclose any and all changes in cost allocation once a facility is constructed. And rightly so, as Order No. 1000 itself acknowledged that it "would be premature and unrealistic to require all regions to adopt specific cost allocation methodologies on an *ex ante* basis that would be applicable to future situations as yet unknown." 136 FERC ¶61,051, ¶651. Indeed, FERC itself has approved the reallocation of the cost of existing facilities, recognizing that the goal of *ex ante* allocation sometimes must give way to unanticipated circumstances. *See, e.g.*, *Indicated SPP Transmission Owners v. Sw. Power Pool, Inc.*, 162 FERC ¶61,213, ¶1 (2018); SPP Open Access Transmission Tariff, attach. O, at 97 (July 26, 2010). The dramatic expansion of demand for wind

energy is precisely the sort of unanticipated "unknown" circumstance for which cost reallocation is appropriate.

Because FERC's late-breaking *ex ante* concern is meritless, so too was its attempt to distinguish SPP's base plan upgrade waiver and PJM's default process on the ground that they are "not subject to Order No. 1000's *ex ante* cost allocation requirement." JA498, ¶31. What matters is how much discretion those processes grant, and both give RTOs much broader discretion than the SPP Board would have under the tariff amendment. *See Sw. Power Pool, Inc.*, 111 FERC ¶61,118, ¶¶52, 57 (2005) (permitting SPP Board to determine based on a list of non-exhaustive factors whether a network upgrade should be reclassified as a base plan upgrade eligible for regional cost-sharing); *PJM Interconnection, LLC*, 174 FERC ¶61,064, ¶5 (2021) (permitting PJM to resolve defaults in one of its markets through "appropriate" action). That said, FERC conceded two paragraphs later that "the Base Plan Upgrade waiver process" *does* "relate to regional transmission cost allocation," JA499, ¶33, so its reasoning does not even make sense on its own terms.

*       *       *

As all that goes to show, FERC's vague speculation about the "potential" for discrimination is just that: speculation. FERC identified no reason why SPP, which has gone to great lengths to secure FERC approval of the waiver process and assuage any concerns about discretion or transparency, would deny waivers when the criteria

are met or grant them when they are not, or otherwise engage in some unidentified form of "discrimination." Nor did FERC explain why the threat of an FPA §206 challenge—open to any party facing "potential" discrimination—would not suffice to discourage any lingering risk of such impropriety. Rather, "[t]he Commission asks [the Court]" to surmise that "at some point in the future," SPP "*might*" make decisions that lead to "an unjust or unreasonable result." *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1314 (D.C. Cir. 1991). The Court should "decline to join the Commission in such speculation," *id.*—especially when it appears to be a thinly veiled excuse for refusing to align the costs and benefits of wind energy, as the cost-causation principle demands.

## CONCLUSION

The Court should vacate FERC's Reversal and Rehearing Orders and remand for further proceedings.

Respectfully submitted,

HELGI C. WALKER
WILLIAM R. HOLLAWAY
JEFFREY LIU
REED SAWYERS
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
hwalker@gibsondunn.com
whollaway@gibsondunn.com
jyliu@gibsondunn.com
rsawyers@gibsondunn.com

ERIN E. MURPHY
NICHOLAS A. AQUART*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
nicholas.aquart@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Petitioner
Midwest Energy, Inc.*

*Counsel for Petitioner Sunflower
Electric Power Corporation*

October 24, 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because it contains 12,682 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

October 24, 2024

                                                    s/Erin E. Murphy
                                                    Erin E. Murphy

# CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy

# ADDENDUM

# ADDENDUM

                                                                    Page

5 U.S.C. § 706 ............................................................................... Add. 2

16 U.S.C. § 824d ........................................................................... Add. 3

16 U.S.C. § 824e ........................................................................... Add. 7

## 5 U.S.C. § 706.    Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

   **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   **(B)** contrary to constitutional right, power, privilege, or immunity;

   **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

   **(D)** without observance of procedure required by law;

   **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

   **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**16 U.S.C. § 824d.  Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

Add. 3

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

**(1)** Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

**(A)** whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

Add. 4

**(B)** whether any such clause reflects any costs other than costs which are—

**(i)** subject to periodic fluctuations and

**(ii)** not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

**(2)** Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

**(3)** The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

**(A)** modify the terms and provisions of any automatic adjustment clause, or

**(B)** cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

**(4)** As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy,

incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

**(A)** the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825l(a) of this title; and

**(B)** each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

## (2) Appeal

If, pursuant to this subsection, a person seeks a rehearing under section 825l(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825l(b) of this title.

**16 U.S.C. § 824e.  Power of Commission to fix rates and charges; determination of cost of production or transmission**

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory,

or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in

cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

**(1)** In this subsection:

**(A)** The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

**(B)** The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

**(2)** If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

**(3)** This section shall not apply to—

**(A)** any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

**(B)** an electric cooperative.

**(4)**

**(A)** The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

**(B)** The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

**(C)** In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.